[May & Thomas Hardware Co. v. Mayor and Aldermen of Birmingham.]

# May & Thomas Hardware Co. *v.* Mayor and Aldermen of Birmingham.

*Action to recover Taxes paid under Protest.*

1. *Constitutional law; validity of statute providing for the amendment of the constitution.*—The act of the General Assembly approved February 16, 1897, to submit to the people of the State at the general election in August, 1898, for their consideration, an amendment to the constitution providing a special tax for the city of Birmingham, which provides that at said election the qualified electors shall vote on said amendment and that the probate judge in each county in the State shall have printed upon the official ballot to be used in their respective counties at said election, the words "For Birmingham amendment," said words to be printed after the names of the candidates for said offices, and "any elector desiring to vote for said amendment shall leave said words intact upon his ballot, and any elector desiring to vote against said amendment shall evidence his intention to so vote by erasing or striking out said words with pen or pencil. The leaving of said words upon the ballot shall be taken as a favorable vote, and the erasure or striking out of said words as aforesaid shall be taken as an adverse vote upon said amendment" (Acts of 1896-97, p. 1202), is not subject to the constitutional objection that it violates the spirit and purpose of section 1 of Article XVII of the Constitution, which requires to the validity of an amendment to the constitution that a majority of all of the qualified voters voting at the election shall vote in favor of the proposed amendment; and such statute is valid and the amendment adopted at an election held in accordance with the provisions thereof is legally and constitutionally adopted.

2. *Same; same.*—Nor is said statute violative of section 1 of Article VIII of the constitution, which prescribes the qualification of electors and guarantees to every citizen possessing the prescribed qualifications the right to vote at their election by the people.

APPEAL from the City Court of Birmingham.
Tried before the Hon. CHAS. A. SENN.

This action was brought by the May & Thomas Hardware Company, a body corporate, against the Mayor and Aldermen of Birmingham, to recover $72.50, demanded of the plaintiff by the defendant and paid by it under protest and after threats of levy as and for city taxes upon its stock of merchandise.

The complaint was as follows: "Plaintiff claims of defendant the sum of seventy-two and 50-100 dollars for so much money by the said defendant had and received to and for the use of plaintiff. And plaintiff avers that on the —— day of May, 1899, and prior to the commencement of this suit, one George Eustis was, and for many years prior thereto had been, the duly elected tax collector of defendant, and on said date the said George Eustis as such tax collector and in the performance of the duties of his said office as such, made a demand upon plaintiff for the payment of the sum of one hundred and forty-five and 50-100 dollars, alleging said sum to be the amount of plaintiff's merchants' tax, including a delinquent fee of fifty cents, due the defendant, levied and assessed upon the plaintiff's stock of merchandise situated in the city of Birmingham for the year 1899, which said sum is one per cent. of the assessed value of plaintiff's stock of merchandise as assessed for State and county taxes for the next preceding year. Plaintiff thereupon refused to pay the sum so demanded on the ground, which was stated to said tax collector, that the amount so demanded was one per cent. of the assessed value of its stock of merchandise assessed for State and county taxes for the preceding year, and was in excess of the amount which defendant had the power, under the constitution of the State, to levy and assess upon its stock of merchandise by one-half of one per cent. of the assessed value thereof as assessed for State and county taxes for the next preceding year, that is to say, by the sum of seventy-two and 50-100 dollars; and that the act of the General Assembly of Alabama, approved December 13, 1898, authorizing the defendant to assess, levy and collect on all property in said city a tax of one-half of one per cent. in addition to the one-half of one per cent. theretofore authorized to be assessed, levied and collected, was unconstitutional and void, in so far as it authorized the assessment, levy

and collection of said additional one-half of one per cent. and that the act of the General Assembly, approved February 16, 1897, proposing an amendment to the constitution so as to authorize the city of Birmingham to levy and collect a tax not to exceed one per centum theretofore allowed by the constitution, and submitting said proposed amendment to the people for ratification, was and is unconstitutional and void. And plaintiff avers that the facts above alleged as the ground upon which plaintiff refused to pay said sum so demanded are true, and that said acts of the General Assembly are unconstitutional and void. And plaintiff thereupon tendered to said tax collector the sum of seventy-three dollars, which sum was half of one per centum of the assessed value of plaintiff's stock of merchandise as assessed for State and county taxes for the preceding year, together with a delinquent fee of fifty cents, and which sum plaintiff further admitted, and now admits, was legally levied and assessed and was and is legally and justly due; and the said tax collector then and there refused to accept said tender on the ground that it was insufficient in amount and did not include said additional one-half of one per centum. And the said plaintiff then declining and refusing to pay the full amount so demanded, as aforesaid, the said tax collector thereupon, on said day, caused execution to be issued and threatened to have the same levied upon, and to seize, take possession of and sell sufficient of plaintiff's property to make the amount of taxes so demanded as aforesaid, as he was authorized by law to do when taxes became delinquent; whereupon the said plaintiff, in order to avoid extra expense and to prevent the seizure and sale of its property, paid to said tax collector under protest the whole sum demanded by him as aforesaid, to-wit, the sum of one hundred and forty-five and 50-100 dollars, which sum included the additional one-half of one per centum levied and assessed under the authority of the act of the General Assembly aforesaid, amount'ng to seventy-two and 50-100 dollars. And plaintiff avers that it protested against the payment of said additional one-half of one per centum, amounting to seventy-two and 50-100 dollars, before paying the same, and paid the same under protest and compulsion

to avoid the seizure and sale of his property, and that it immediately demanded that said sum so paid under protest be refunded to it, which demand was thereupon refused. And plaintiff further avers that before the commencement of this action it made application to the Board of Mayor and Aldermen of Birmingham for the repayment to it of the amount so paid under protest as aforesaid, and that said application was, before the commencement of this action, refused."

The plaintiff, by leave of the court, amended its complaint by adding thereto the following paragraph:

"Plaintiff further avers that the official ballot used by the voters was such as was prescribed as to voting on said constitutional amendment as prescribed by the aforesaid act of the General Assembly, approved February 16, 1897, and that said ballot contained only the words 'For Birmingham Amendment,' and further that the returning officers of said general election held first Monday in August, 1898, did not open a separate poll for the vote of the qualified electors on the proposed amendment, and said returning officers did not make a return of said vote to the Secretary of State as required by Article XVII, section 1, of the constitution, but said returns were made by the board of supervisors as prescribed by section 4 of the act of February 16, 1897."

The defendant moved to strike out of the complaint the paragraph added by amendment, upon the following grounds: 1st. That such averments proposed an immaterial, irrelevant and impertinent issue. 2d. The plaintiff's cause of action is shown to rest alone upon the proposition that what is known as the Birmingham Amendment is not a part of the Constitution of Alabama, and this is a pure question of law. 3d. The election upon said Birmingham tax amendment may not be contested, nor its validity made to depend upon any issue of outside facts which the parties to this suit may or may not propose. 4th. The manner of holding the election can not be collaterally assailed by said averments proposed.

This motion was sustained. Thereupon the defendant demurred to the complaint upon the following grounds: "1st. Complaint shows that the tax was levied and col-

lected in accordance with law. 2d. The court will take judicial notice of the adoption of the constitutional amendment, authorizing the levy and collection of tax set out in said complaint. 3d. The complaint shows that the tax collector collected said tax in discharge of his duties, in accordance with the constitution and laws of Alabama. 4th. The complaint shows that plaintiff's right of recovery is based upon the proposition that the constitution of Alabama does not authorize a levy of one per cent. for taxes, and the court knows judicially that the constitution does authorize such levy. 5th. The Birmingham Tax Amendment has been duly adopted and proclaimed and fully authorized the tax collected." This demurrer was sustained, and the plaintiff declining to amend his complaint or to plead further, judgment was rendered in favor of the defendant. The plaintiff appeals, as assigns as error the rulings of the court in sustaining the motion and the demurrer of the defendant.

H. C. SELHEIMER and DENSON & TANNER, for appellants.—The third section of the act authorizing the adoption of the Birmingham Amendment to the constitution renders said act unconstitutional, and the election held under such statute was illegal. This section of the act, it is contended, is void, (and of consequence the amendment declared to have been adopted at the election held under this section is void) for the following reasons:

First.—Because it violates the spirit and purpose of Sec. 1 of Art. XVII of the Constitution, which provides that an amendment shall be valid if "a majority of all the qualified electors of the State, who voted at said election voted in favor of the proposed amendment." (The grounds of this contention, as set forth in the brief of appellants' counsel, are copied in the opinion).

Everything contained in Sec. 1 of Art. XVII of the Constitution indicates that it was the purpose of the framers of the constitution not to permit any amendment thereto.to be effected by means of the indifference, or non-action or mere passiveness of the people, or by reason of their ignorance of the fact that any proposition to amend the constitution was pending to be voted on. For this purpose it was provided, first, that the election

should be held at the next general election for representatives, because it was well known that at such general election a greater number of citizens would vote than at any special election, and therefore a greater number of positive, affirmative votes would be required in order to carry the amendment; and, second, that an amendment should be valid only in the event that "a majority of all the qualified electors of the State, who voted at the election, voted in favor of the proposed amendments."

The plain inference from these provisions is that no amendment to the constitution can be adopted except by the positive, affirmative action on the part of a majority of all the qualified electors of the State who vote at the election, manifesting an intention to vote in favor of the amendment. This intention cannot, of course, be manifested by one who is ignorant of the fact that any proposition to amend the constitution is pending to be voted on, nor by one who is so indifferent as to refrain from voting on the proposition. The intention must be expressed in an affirmative manner and cannot be presumed from non-action, nor can an expression be compelled by making such expression the condition upon which the elector shall be allowed to exercise his constitutional privilege to vote for State and county offices to be filled at the election. Such, we contend, was the purpose of the framers of the constitution sought to be effected by these provisions. Yet, although a majority of the electors of the State, who voted at the election held under this statute for State and county offices, may have had no intention to vote upon the proposition to amend the constitution, or may have been ignorant that such proposition was pending, the ballot forced upon them by this statute, containing only the words "For Birmingham Amendment," had to be counted in favor of the amendment, because by reason of their indifference or ignorance, they failed to strike out the words "For Birmingham Amendment." We submit, therefore, that under the provisions of this statute an amendment to the constitution might be declared adopted although a majority of all the electors of the State, who voted at the election, did not intend to vote in favor thereof, or did not, by any positive, affirmative act, manifest an inten-

tion to vote in favor thereof, and that this result was the real purpose of the statute in requiring such a form of ballot, and such a method of expressing the voter's will.

Again, the statute is unconstitutional because it takes away from the elector his right, recognized by the constitution, to refrain from voting on the proposition to amend the constitution. An elector is under no obligation to vote for all the offices to be filled, or upon all the propositions to be voted on.—Cooley Const. Lim. orig. p. 614. He has a right to vote for some and to refrain from voting for others. This right to refrain from voting on the proposed amendment, and the probability that many of the electors would exercise the right, was recognized by the framers of the constitution in the provision which requires for the adoption of an amendment a majority of all the qualified electors of the State who vote at the election. This provision is equivalent to a provision that if a majority of all the electors of the State, who vote at the election, refrain from voting on the proposed amend· ment, or if such a number refrain as that, when added to the number of those who vote directly against the amendment, the whole shall be a majority of all those who vote at the election, the amendment shall be invalid.

The statute violates Sec. 1 of Art. VIII of the Constitution, which fixes the qualifications of voters and guarantees to every citizen possessing these qualifications the right to vote at every election by the people. This provision of the constitution does not require the elector to vote for all the offices to be filled nor upon all the propositions submitted, but permits him to vote for some and to refrain from voting for others. It confers a mere privilege, which may be exercised by the citizen or not, as he chooses. But it cannot be doubted that to the constitutional guaranty that every elector shall have the right to vote at every election by the people, the legislature has no power to impose the condition that he shall not exercise that right unless he vote for all the offices to be filled or upon all the propositions submitted at the election. Yet the legislature has attempted by this statute to exercise this power by giving to the elector no opportunity to refrain from voting on the proposed amendment, except by also refraining from voting for any

State or county office. The constitution requires that all
lews regulating elections "shall be uniform throughout
the State."—Sec. 5, Art. 8. Even in the absence of such
express provision, it is well settled that laws regulating
elections must be uniform, fair and impartial.—*Att'y
Gen. v. Detroit*, 78 Mich. 545; *Capen v. Foster*, 12 Pick.
(Mass.) 488; Cooley Const. Lim. orig. p. 602. By the
provision of our constitution it was probably intended to
require that election laws should operate equally in
every part of the State. It would seem that if it has the
power to require a different method of indicating his
choice upon a proposition to amend the constitution from
that required to express his choice for State and county
offices to be filled, it would have the power to require a
different method of expressing the elector's choice as to
each of the various offices to be filled. This would
amount to practical disfranchisement in many instances,
and would be unconstitutional for that reason.

If we have properly construed Sec. 1 of Art. XVII of
the Constitution, and ascertained the true purpose and
spirit of its provisions, then, clearly, the statute is in
direct conflict with the constitution and is unconstitu-
tional and void, and if void, the election authorized by
and held under said statute must be void, and the pro-
posed amendment is not a valid part of the constitution
of the State, notwithstanding the Governor's proclama-
tion, authorized by the statute, making known the result
of the election. It cannot be that the election and the
Governor's proclamation announcing the result pre-
cludes all inquiry into the constitutionality of the statute
authorizing the election and subsequent proclamation.

CABANISS & WEAKLEY, *contra*.—1. The constitution
(in reference to the method of its amendment) does not
prescribe the form of the ballot, nor method of voting,
and hence these matters must be left to reasonable legis-
lative regulation. This proposition is not denied, but
conceded by appellant's counsel,—"The form and con-
tents of the ballots to be used in general or special elec-
tions are almost always provided for in the statutes au-
thorizing such elections. It has been said that if the bal-
lot expresses the intention of the voter beyond a reason-

able doubt, it is sufficient, without regard to technical inaccuracies in its form."—Am. & Eng. Encyc. Law (2d ed.), p. 708.

2. Statutes providing for official ballots and their exclusive use are valid.—Am. & Eng. Encyc. Law, (2d ed.), p. 709, and note 3; *Cole v. Tucker*, (Mass.) 29 L. R. A. 668.

3. Whether a regulation be reasonable or unreasonable is for the determination of the legislature, and not for the courts, so long as such regulation does not become destructive.—*Common Council v. Rush*, (Mich.) 10 L. R. A. 171. "When power is conferred upon the legislature to provide instrumentalities by which certain objects are to be accomplished, the sole right to choose the means accompanies the power, in the absence of any constitutional provision prescribing the means. The finding by this court that the law impeded, hampered or restricted the right to vote, and is therefore void, would be a clear assumption of and encroachment upon legislative power—a substitution of our judgment for that of the legislature. *It can only be declared void when it destroys the right.* Its unconstitutionality can be determined by no other rule."—10 L. R. A. 171.

4. Although amendments may be proposed by joint resolution, yet they may also be proposed by a formal bill containing statutory regulations concerning the election, and such regulations have all the force and effect of a formal statute.—*Nesbit v. People*, (Cal.) 36 Pac. 221; *In re Senate File No. 31*, (Neb.) 41 N. W. 981; *State v. Mason*, (La.), 9 So. Rep. 776; Jameson on Constitutional Conventions, § 561.

5. The two important vital elements of a valid constitutional amendment are the assent of two-thirds of the legislature and of a majority of the voters, voting at the general election. The other provisions are mere machinery and forms.—*Prohibitory Amendment Case*, 24 Kan. 700; *Lovett v. Ferguson*, (S. Dak.) 71 N. W. 765; *State v. Herried*, 72 N. W. 93; *In re Senate File 31*, 41 N. W. 981, 987.

6. It is no objection to an election or ballot regula-

tion, that under it, one voter may vote more easily than
another, or that it is easier to vote for one party or set
of candidates than another, so long as the voter's right
to freely vote is not obstructed.—*State v. Black,* (N. J.),
16 L. R. A. 769; *Dewalt v. Bartley,* (Pa.), 15 L. R. A.
771; *Ritchie v. Richards,* (Utah), 47 Pac. 670.

7. This court will not go behind the Governor's
proclamation, nor inquire into the form of ballot used
or method of election, or making of returns.—*Worman
v. Hagan,* (Md.), 21 L. R. A. 716.

McCLELLAN, C. J.—Article XVII, § 1 of the consti-
tution is as follows: "The general assembly may, when-
ever two-thirds of each house shall deem it necessary,
propose amendments to this constitution, which, having
been read on three several days in each house, shall be
duly published in such manner as the general assembly
may direct, at least three months before the next general
election for representatives, for the consideration of the
people; and it shall be the duty of the several returning
officers, at the next general election which shall be held
for representatives, to open a poll for the vote of the
qualified electors on the proposed amendments, and to
make a return of said vote to the secretary of state; and,
if it shall thereupon appear that a majority of all the
qualified electors of the State, who voted at said election,
voted in favor of the proposed amendments, said amend-
ments shall be valid, to all intents and purposes, as parts
of this constitution; and the result of such election shall
be made known by proclamation of the Governor." Un-
der; and in supposed conformity to this organic pro-
vision, the general assembly of 1896-97 passed an act
"To submit to the people of the State at the general elec-
tion to be held on the first Monday in August, 1898, for
representatives, for their consideration, an amendment
to section seven, article eleven of the constitution, pro-
viding a special tax of one-half of one per centum for the
city of Birmingham, to be applied to the payment of in-
terest on the bonds of said city, and for a sinking fund
to pay off said bonds at the maturity thereof." Section
1 of this act proposes the amendment indicated in the
title and sets forth the terms and form thereof. Section

2 provides for the publication of the proposed amendment. And section 3, relating to the taking of the vote of the electors on the proposed amendment, is as follows: "Sec. 3. *Be it further enacted,* That at the general election to be held on the first Monday in August, 1898, the qualified electors shall vote on said amendment, and it shall be the duty of the probate judge in each county of the State to have printed upon the official ballot to be used in their respective counties at said election the words, 'For Birmingham Amendment,' said words to be printed after the names of candidates for State offices and before the names of candidates for county offices. Any elector desiring to vote for said amendment shall leave said words intact upon his ballot, and any elector desiring to vote against said amendment shall evidence his intention to so vote by erasing or striking out said words with pen or pencil. The leaving of said words upon the ballot shall be taken as a favorable vote, and the erasure or striking out of said words as aforesaid shall be taken as an adverse vote, upon said amendment." Section 4 of the act provides for a count of the "votes given on the proposed amendment," and section 5 provides for proclamation by the Governor of the result if favorable to the amendment.

This statute was complied with, the proposed amendment was submitted to the electors, voted upon and adopted by them according to the terms of the enactment, the vote was counted, the result declared, and the Governor issued his proclamation making known the result. The city of Birmingham levied the additional tax of one-half of one per cent. authorized by this supposed amendment, and assessed the taxable property of the city accordingly. The May & Thomas Hardware Company paid this additional tax on its property upon compulsion and under protest to the tax collector of said municipality, and brings this action to recover back the amount so paid upon the ground that said amendment was not submitted to the electors of the State in the mode provided by the constitution, hence was not constitutionally adopted, and is not part of the organic law; and, confessedly, if this position be well taken the tax is illegal, and plaintiff is entitled to recover. The city court sus-

tained the amendment, and entered judgment for the defendant, and from that judgment this appeal is prosecuted.

And the position of appellant, as we understand it, is that section 3 of the act is unconstitutional and void, (and that of consequence the amendment declared to have been adopted at the election held under it is likewise void) for that, *first*, that section violates the spirit and purpose of section 1 of Article XVII of the Constitution, quoted above, which requires to the validity of an amendment that a majority of all the qualified voters voting at the election shall vote in favor of the proposed amendment, and, *second*, that the statute, or rather said section 3 thereof, is violative of section 1 of Article VIII of the Constitution, which prescribes the qualifications of electors, and guarantees to every citizen possessing the prescribed qualifications the right to vote at every election by the people.

And the argument in support of the first proposition is, in the brief of appellant's counsel, thus epitomized:

"(a). Under the provisions of the statute, the amendment might be declared adopted although a majority of all the qualified voters of the State, who voted at the election, had no intention, when they voted for State and county offices, to vote upon the proposed amendment, or did not manifest any intention to vote for the amendment, or desired to refrain from voting on the proposition.

"(b). The provisions of the statute render it impossible to ascertain with certainty whether a majority of all the electors of the State, who voted at the election, actually and affirmatively voted for the amendment within the spirit and meaning of the constitution.

"(c). The constitution requires positive, affirmative action on the part of the elector to manifest an intention to vote *in favor* of the amendment, and *no action* to manifest an intention to vote against it: this statute requires positive, affirmative action on the part of the elector to manifest an intention to vote *against* the amendment, and no affirmative action to manifest an intention to vote in favor of it.

"(d). The constitution presumes that every elector who votes for any State or county office at the election but fails to vote, or for any reason refrains from voting on the proposition to amend *is against the* amendment, and, in effect, requires his ballot for State and county offices to be counted as a vote against the amendment: this statute assumes that every elector who does not wish to vote directly against the amendment by striking out the words 'For Birmingham Amendment,' will vote *in favor* of it, and requires his ballot to be counted in favor of the amendment, although he may have had no intention to vote in favor of it, or any knowledge that any such proposition was pending to be voted on."

It may well be assumed that the foregoing skeleton of counsel's argument presents every consideration worthy of attention against the validity of this statute under section 1 of Article XVII of the Constitution. Certainly no other plausible objection to its integrity occurs to us; and upon the positions taken by them we will consider this part of the case. In the outset it is, of course, to be admitted that it is essential to the adoption of any proposed amendment to the constitution that a majority of the electors voting at the election at which the proposition is submitted should vote for the amendment: That is the plain requirement of the organic law. And, of course, any statute which undertook to provide for the adoption of such an amendment upon a less number of favoring votes than a majority of those so voting, or which made it possible, in legal contemplation, for the amendment to rest upon the favoring votes of a minority of the electors so voting, would be violative of the constitution and void. It is further to be taken for granted that *a vote for* a proposition necessarily implies *the expression* of the voter's opinion, position or preference in favor of or for that proposition; and a statute which authorizes or admits of the counting for a proposed amendment to the constitution a ballot which does not involve directly or by necessary implication such expression favorable thereto would be invalid and of no effect. And so the inquiry in this connection is, whether this statute authorizes or admits of the counting for this amendment of ballots which can be said not to evidence the voters'

predilection for and intention to support the amend-
ment, or rather, which cannot be said to manifest such
predilection and intention. We do not think the enact-
ment authorizes or admits of any such thing. Every
voter is presumed to know what is on any ballot he de-
posits as an expression of his will upon men and meas-
ures submitted for his consideration and action as an
elector. Every voter who can read does know what his
ballot contains. And the law furnishes the illiterate
voter with easy and convenient means of information as
to what his ballot contains. And when he deposits it,
the presumption of law is that he, as well as his educated
fellow elector, knows what is upon it and has expressed
the desire as between candidates and upon propositions
which the paper indicates. This presumption of law is
absolutely essential to popular government. The pre-
sumption is indulged because every practical means has
been resorted to to acquaint the voter with the contents
of his ballot and he in fact does know its contents. If
the fact were otherwise the presumption could not exist,
and government by ballot would be impossible. Until
within a few years past, it was and for long had been,
under the present and former constitutions, the law and
practice for the names of only a certain set of candi-
dates, the nominees of a political party, to appear upon
a ballot. The voter who deposited such a ballot with-
out erasing any of the names upon it thereby expressed
his choice of all the persons whose names so appeared.
If he wished not to vote for any person on the ticket, he
could do so only by striking out that name. If he wished
to vote for a person for a particular office whose name
did not appear on the ballot he would have to strike out
the candidate for that office whose name did appear, and
substitute the name of the person of his choice. If he
erased no name, he was conclusively presumed to have
voted for every person on the list. Or, when there had
been no party nominations and all candidates for a giv-
en office appeared on the same ballot, as frequently oc-
curred, the voter had to erase the names of all the can-
didates except the one for whom he intended to vote; and
if he left all the names on the ballot he was held to have
voted for the person whose name first appeared thereon;

and that all candidates might have equal advantage in view of the law on this point, it was the custom to give priority on the ballot to each on an equal number of tickets, so that if A. B. and Y. Z. were candidates for an office and a thousand tickets were printed, the name of A. B. would appear first on five hundred tickets and that of Y. Z. would appear first on the remaining five hundred. And where there was a party ticket and no erasure upon it, the conclusive presumption of law was that the voter intended to vote for every person whose name appeared to fill the office for which he was a candidate as indicated by the ticket; or, in other words, that he knew all that the ticket contained, and adopted it as the expression of his views, and there was really never any question of fact as to whether such tickets actually represented the intent of the voters: they always did. So where the names of two or more candidates for the same office appeared, and there was no erasure, the law held the voter to a knowledge that under the law the first named person would be credited with having received his vote; and, while, as we have seen, there was some notion abroad under this provision of law and the practice that in such case the person first named might be credited with votes which were not intended to be cast for him, or for the office at all, leading to the alternation of names through a series of tickets yet, it was never seriously questioned that such a ballot represented in point of fact the affirmative choice of the voter for the first named candidate. And such was the necessary and conclusive presumption of law based upon substantial uniformity of fact. Affirmative manifestation of the voter's intent was as essential then as it is now; and it was then and is now as essential in respect of the election of officers as it was then and is now in respect of propositions submitted to the electors. And it was then and has always been held that the neccessary affirmative manifestation of intent is that manifestation which appears on the words of the ballot which the voter deposits, even when those words take on a peculiar meaning from their collocation by sheer force of a statute of which the voter might be entirely ignorant; and all this regardless of the voter's illiteracy. How much stronger then and more fully jus-

tified is the presumption when a voter casts a ballot upon
which is printed the information that an amendment to
the Constitution is to be voted upon, and that if he de-
posits that ballot as it is he expresses his favor for the
amendment, when, to state this case, there is printed
on the official ballot the words "For Birmingham amend-
ment"—how much nearer to absolute certainty is the
affirmative expression of his will, and that it is an affir-
mative manifestation of his purpose to support and favor
the amendment. And this is all the Constitution in res-
pect of the adoption of such amendments requires: that
the voter shall vote for the amendment, that he shall
favor the adoption of the amendment, that he shall de-
posit a ballot which on its face, assuming knowledge on
his part of its contents, evidences his wish that the pro-
posed amendment should become part of the organic law.
And so, indulging this presumption, because it is justi-
fied by the facts and is a *sine qua non* to government by
the people, there is no difficulty in ascertaining with the
same certainty that has always sufficed in elections
whether a majority of the voters voting at the election
provided for in this act "actually and affirmatively voted
for the amendment within the spirit and meaning of the
Constitution." Since the result is to be arrived at by
counting for the amendment all the ballots which have
the words "For Birmingham amendment" intact upon
them, and against it all those ballots from which those
words have been erased, there is no danger of the adop-
tion of the amendment being declared although a major-
ity of the voters had no intention to vote on or for the
amendment; but to the contrary the ballots themselves
conclusively evidence that manifestation of the voters'
intention which the Constitution requires. And this is
all that the Constitution does require—a majority of the
votes cast at that election *for* the amendment. When
there is such majority shown by affirmative ballots, the
Constitution is not concerned about the minority. If
that minority desired not to vote at all on the proposi-
tion and so to be counted against it, the fact that under
this act they had to vote one way or the other, had either
to strike off the amendment, and so vote against it, or
to leave it on, and so vote for it, does not destroy the

21

integrity of the majority of the whole vote at that election, who have in legal contemplation affirmatively expressed their favor for the amendment. The whole argument for appellant on this part of the case, it seems to us, is at fault in assuming that the casting of a ballot upon which is printed the words "For Birmingham amendment," is not *affirmative action* on the part of the voter in favor of the amendment. That assumption being eliminated, the argument falls to the ground, and the conclusion we are asked in this connection to draw against the law has nothing to rest upon.

As part and in conclusion of our discussion of the case in this connection, we adopt an opinion upon it prepared by Judge R. W. Walker at the instance of appellee's counsel. After stating the provisions of section 3 of the act, he says:

"The question submitted is: Is there anything in the Constitution of Alabama which prohibited the legislature from making the regulation contained in said section in respect of the preparation of the ballot and the manner of voting; in other words, was it competent for the legislature to prescribe that the words 'For Birmingham amendment' should be printed on the official ballots, and to declare that 'the leaving of said words upon the ballot shall be taken as a favorable vote, and the erasure or striking out of said words shall be taken as an adverse vote upon said amendment?'

"The extent of the requirements of the Constitution of Alabama touching the method of voting upon a proposed amendment of that instrument is the provision that all elections by the people shall be by ballot, and the provision for the opening of a poll for the vote of the qualified electors on the proposed amendment. These two provisions together amount simply to a requirement that a proposed amendment shall be submitted to the qualified electors of the State for their vote upon it by ballot. The Constitution expressly remits to the general assembly the matter of regulating and governing election by laws which are required to be uniform throughout the State. It cannot be doubted that the form of the ballot and the method of indicating the voter's choice are matters for legislative regulation. Of

course, it would not be competent for the legislature,
under the guise of regulations, to effect a practical de-
nial of the free exercise of the elective franchise.   But
there can be no question of a regulation really amount-
ing to a deprivation of the right to vote where the mean-
ing of what is put upon the ballot required to be used
by the voter is plain to a commin understanding, and the
method prescribed for the indication of his choice by the
voter is easy to be comprehended and not difficult to be
followed.   It is certainly not unreasonable to assume
that the voter is to inform himself of the contents of the
ballot he casts, where the meaning is obvious to one
who can read, and could not be misunderstood by an
illiterate voter who seeks information as to what is upon
the ballot put into his hands.   The words 'For Birming-
ham amendment,' printed in a conspicuous place upon
the ballot in question, plainly indicate a choice in favor
of the amendment.   A voter casting a ballot known to
have these words upon it must have understood that he
was thereby expressing himself in favor of the amend-
ment.   If he wished to vote against the proposed
amendment, all that was required was the erasure or
striking out with pen or pencil of those words.   The
method prescribed by the statute for the voter indicat-
ing his choice to vote for or against the amendment was
simplicity itself; and, though that method varied from
the one adopted in the recently enacted general election
law, yet it was a method by no means unfamiliar to the
electors of the State.   As to the method of voting on
this amendment, the legislature simply revived the old
way, familiar to the people, of casting an adverse vote
by 'scratching the ticket.'  It seems that any suggestion
against the validity of the provision in question must be
based upon the assumption that it was not competent
for the legislature to make a provision in reference to
the ballot which involves the possibility of a vote in
favor of a person or proposition being the result of the
voter's deliberate or negligent failure to inform himself
of the contents of the ballot he casts and of the method
prescribed by law for the indication of his choice.   Any
such assumption I regard as wholly unwarranted.
Where the method of indicating his choice the one way
or the other is plain and simple, the provision on the

subject cannot be rendered invalid by the mere possibility that, as the result of the carelessness of the voter, his act in casting his ballot may have an effect not actually contemplated by him."

And so we conclude that the first objection to the act relied on, as stated in the beginning of this opinion, by appellant's counsel is untenable and unavailing.

Of the second ground of objection to the act above stated little, we think, need be said. It is, to repeat, that "the statute violates section 1 of Article VIII of the Constitution, which fixes the qualifications of voters and guarantees to every citizen possessing these qualifications the right to vote at every election by the people." And the argument is that inasmuch as the Constitution does not require the elector to vote upon all offices to be filled at an election, but only in respect of such as he desires, and that, as is insisted, the same principle obtains in respect of an amendment, so that the organic law contemplates that an elector voting for candidates for office may refrain from voting for amendments, this statute adds an additional qualification in that it requires him to vote on this amendment as a necessary incident to his vote on offices, or as said by counsel: "The statute takes away from the elector his right, recognized by the Constitution to refrain from voting on the amendment and at the same time to vote for the State and county offices to be filled at the election." This position takes no account of the consideration that under any possible form of submitting a proposed amendment to the people every elector who votes for a State or county office at the election must through the operation of the Constitution itself in effect vote for or against the amendment. Article XVII, section 1 provides, as we have seen, that an amendment must receive "a majority of all the qualified electors of the State who vote at" the general election to which it is submitted, a majority, not of those who vote on the amendment, but of those who deposit ballots for any purpose. Hence it is that if an elector votes for a State or county office, he necessarily votes on the amendment, for though his ballot contain no reference to the amendment he is counted against it. So that by the terms of the Constitution

[Faulk et al. v. Calloway.]

itself he is deprived of the right to refrain from voting on an amendment if he votes for any State or county office; and the statute.cannot be violative of the Constitution for having this same operation and effect. The most that can be said of the statute in this connection is that under it it is easier for the elector to vote for the amendment than against it, in that to vote against it he is put to the physical exertion of drawing a pen or pencil through the words "For Birmingham amendment," and he may vote for it without doing this; and of this it is sufficient to say that such regulations have been several times, and we think correctly, held valid. *State r. Black*, (N. J.) 16 L. R. A. 769; *Dewalt v. Bartley*, (Pa.) 15 L. R. A. 771; *Ritchie v. Richards*, 47 Pac. 670.

And upon the case, our conclusion is that the statute is valid, that by the result of the election held under it the "Birmingham Amendment" became part of the Constitution of the State, and that plaintiff below was not entitled to recover back taxes levied and assessed as authorized by it. So the city court held, and its judgment is affirmed,

Affirmed.